IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02912-MEH

RENEE ROMERO,

      Plaintiff,

v.

ANDREW SAUL, Commissioner of Social Security,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Renee Romero appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), originally filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–33.   Jurisdiction is proper under 42 U.S.C. § 405(g).   The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of the appeal.   After consideration of the parties' briefs and the administrative record, the Court affirms the decision of the ALJ.

## BACKGROUND

### I.      Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying her applications for DIB and SSI filed on October 11, 2016.   Administrative Record ("AR") 186, 209.   The SSA denied Plaintiff's applications for DIB and SSI on May 2, 2017.   AR 15.   The Administrative

Law Judge ("ALJ") held a hearing on August 8, 2018, AR 134, at which Plaintiff, Plaintiff's counsel, and a vocational expert appeared.   AR 31–52.   The ALJ issued a written ruling on October 26, 2018, finding Plaintiff was not disabled during the relevant time period of September 1, 2016 to October 26, 2018, reasoning that Plaintiff could successfully adjust to other work existing in significant numbers in the national economy when considering Plaintiff's age, experience, and residual functional capacity.   AR 12–28.   On August 21, 2019, the SSA Appeals Council denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review.   AR 1–6.   *See* 20 C.F.R. § 404.981.   Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II.   Plaintiff's Alleged Conditions

Plaintiff was born on October 28, 1969; she was forty-six years old when she filed her DIB and SSI applications on October 11, 2016.   AR 186.   Plaintiff claims that she became disabled on September 1, 2016 due to spondylolisthesis, severe arthritis, lumbar degeneration, chronic pain in the back, knees, feet and spine, type 2 diabetes, high cholesterol, high blood pressure, chrondomalacia patella, heel spurs, plantar fasciitis, polycystic ovarian syndrome, anxiety, asthma, and sleep walking.   AR 54–55, 186.

Plaintiff worked for Bayaud Enterprises for twenty-seven years, where her duties included performing security clearances and supervising other employees.   AR 34, 46–47.   Evidence in the record shows that, at least as early as 2003, Plaintiff sought medical care for back pain and right knee pain.   AR 292–303.   In December of 2003, she was diagnosed with bilateral L5 pars

2

defects, Grade I spondylolisthesis, and degenerative disc disease with marked disc narrowing at the L5-S1 vertebrae.   AR 310.   As early as 2004, Plaintiff rated her pain as a "ten" on a scale of one to ten.   AR 312, 321.   That year, she reported to doctors that she had difficulty walking more than thirty feet, standing longer than a few minutes, and difficulty working and sleeping due to discomfort while sitting.   AR 312.   In August of 2004, Plaintiff received injections in her back to relieve her pain, AR 311, reporting that they provided pain relief for approximately six months. AR 313.   In 2005, she received several more injections in her right knee and her back.   AR 313–14, 326–27.

The record next indicates that, on July 1, 2016, Plaintiff visited Dr. Daniel P. Jones after her spinal injection had worn off and inquired about whether surgery would improve her condition. AR 380–382.   Plaintiff complained of back pain and some numbness in her right leg that reportedly caused difficulty working, and she had increased her use of Vicodin.   *Id.*   Dr. Jones noted that Plaintiff was in no distress during the visit.   AR 380.

On November 1, 2016, Plaintiff saw Dr. Joshua M. Scheidler for a consultation regarding several symptoms, including continued back pain that had worsened over the past six months, radiating arm and leg pain, and a mood disorder.   AR 397–404.   At the appointment, Dr. Scheidler noted that Plaintiff had severely limited flexion and moderately reduced extension of the lumbar spine, some cervical axial pain, tenderness in her lumbar spine, and decreased light touch in her right L5 dermatome.   AR 402.   The assessment also revealed that Plaintiff had full range of motion in her cervical spine, symmetrical reflexes in the extremities tested, normal and symmetrical muscle bulk in upper and lower extremities, normal tandem and heel-toe walking,

and full muscle strength in most muscles tested.   AR 402–03.   Plaintiff denied having gait dysfunction, loss of manual dexterity, or weakness in her arms and legs, and Dr. Scheidler noted that Plaintiff was in no apparent distress.   AR 401–02.   Dr. Scheidler diagnosed Plaintiff with chronic low back pain, lumbar radiculopathy, and cervical radiculitis.   AR 400.   He prescribed a four-wheeled walker, encouraged her to stay active and discussed exercise options, scheduled an injection in her back, and referred her to a chronic pain skills class.   AR 403–04.

On November 30, 2016, Plaintiff met with Dr. Jones for at least fifteen minutes to discuss treatment options.   AR 426.   Dr. Jones noted that Plaintiff experienced no pain improvement since her previous facet injection two weeks prior and that she was unable to work and was looking into disability.   *Id.*   He further noted that Plaintiff planned to consult with neurosurgery professionals about surgical options to control her pain.   *Id.*   He completed a Med-9 form for Plaintiff's application for disability benefits, opining that Plaintiff would be "totally and permanently disabled" for at least twelve months due to musculoskeletal disorders.   AR 328, 426–27.

On December 20, 2016, Plaintiff underwent an electromyogram (EMG), and the test results indicated "minimally abnormal" findings that were "consistent with, but not diagnostic of bilateral L4-L5 radiculopathy."   AR 441–44.   The doctor observed no active denervation and noted there was no electrodiagnostic evidence of peripheral polyneuropathy, or isolated tibial or peroneal neuropathy affecting Plaintiff's more symptomatic lower right extremity.   AR 444.

MRI scans in March 2017 showed chronic bilateral L5 spondylolysis in Plaintiff's lumbar spine with slight interval increase, "L5 anterolisthesis with uncovering of disk bulge and superior

disk hernia with comparable severe bilateral right greater than left foraminal narrowing and dis[c]ogenic endplate changes."   AR 353.   In the cervical spine, the MRI showed "mild diffuse disk degeneration" but "no significant canal or foraminal narrowing at any level" and "no nerve impingement."   AR 351–52.   Later that month, Plaintiff saw Dr. Erik Parker to discuss options for surgical intervention.   AR 334–35.   They jointly decided that Plaintiff should undergo lumbar fusion surgery.   *Id.*   On April 10, 2017, Plaintiff returned to Dr. Jones for multiple concerns related to lower back pain, right shoulder pain, pain control, and her disability paperwork. AR 341–44, 624–25.   Regarding her shoulder, Plaintiff exhibited a "decreased range of motion, tenderness and pain[,]" with normal strength and no swelling.   AR 342.   Dr. Jones provided an injection, which "helped for many months."   *Id.*, AR 568.   Dr. Jones also granted Plaintiff's request for a wheelchair to "help with mobility due to fall risk and low back pain."   AR 342, 344.

On April 25, 2017, on referral from the SSA, Plaintiff saw the psychologist, Aimee Henley, Ph.D., for a consultative psychological evaluation.   AR 59, 486.   She arrived in a wheelchair but was able to slowly stand and transfer to a chair without obvious pain.   AR 488.   From the evaluation, Dr. Henley noted that Plaintiff had no impairment in comprehension or memory, mild impairment in attention and sustained concentration, and marked impairment in her persistence and pace due to physical issues.   AR 489.   She also noted that Plaintiff "met the criteria for adjustment disorder with mixed anxiety and depressed mood due to chronic pain and medical issues," but stated that determining whether Plaintiff was incapable of working due to her physical limitations was "outside the scope of th[e] evaluation."   *Id.*

On May 1, 2017, Plaintiff's initial claim for disability was denied.   AR 54.   The determination contained a medical evaluation from Dr. Lewis J. Barton, a non-examining state agency medical reviewer.   AR 58–60.   Reviewing Plaintiff's medical evidence submitted through April 26, 2017, Dr. Barton opined that Plaintiff could perform a range of light work.   AR 58–63.   The determination also contained a psychological evaluation from Lois Huebner, Ph.D., a non-examining state agency psychiatrist.   AR 63–64.   Dr. Huebner reviewed Plaintiff's submitted mental health records, including the examination from Dr. Henley, and opined that Plaintiff's "ability to complete a normal workweek without interruptions from psychologically based symptoms" was "not significantly limited[,]" and that Plaintiff "should be capable of carrying out simple 2–4 step tasks that are consistent with her physical capabilities."   AR 64.

On May 8, 2017, as ordered by Dr. Parker, Plaintiff received another steroid injection for her lower back.   AR 645.   A month later Dr. Jones adjusted her pain medications because of complaints of increased pain.   AR 612, 615–16.

On July 24, 2017, Plaintiff underwent spinal fusion surgery, performed by Dr. Parker and Dr. Jonathan Vu.   AR 503–12.   Upon discharge, Dr. Parker approved light activity as tolerated, walking for twenty minutes three times a day, no driving while on narcotics, and lifting items no heavier than five pounds.   AR 505.   On August 14, 2017, Plaintiff reported to Nurse April Burke for a post-operative incision check, indicating "generalized soreness in [her] back and aches in [her] legs," numbness in her feet, but "nerve pain [that was] much improved."   AR. 587.   Nurse Burke noted that Plaintiff had full strength in her lower extremities and encouraged her to walk at least thirty to forty-five minutes per day.   *Id.*   On September 15, 2017, Plaintiff visited Dr.

Parker for a post-operative examination, reporting continued back and leg pain.   AR 582.   Dr. Parker advised that this pain would likely improve with further healing, and he encouraged her to continue walking and to try water-walking in a pool.   *Id.*   On October 30, 2017, Plaintiff saw Dr. Parker again for a twelve-week post-surgical examination, reporting that her ambulation had improved since surgery, she no longer needed a wheelchair, but that she still experienced pain in her back and lower extremities.   AR 577.   Dr. Parker noted that Plaintiff had full strength in her lower extremities, reflexes measured at 2+, and intact sensations.   *Id.*

On November 7, 2017, Plaintiff began physical therapy with Brandi Palski, at which she reported having low back pain that radiated to her lower extremities, plus numbness and tingling in her feet.   AR 571.   Palski wrote that Plaintiff had a decreased range of motion and strength in her core and hip, decreased endurance, and difficulty moving from a sitting to a standing position. *Id.*   She encouraged Plaintiff to continue walking every day and to ride her stationary bike every other day.   *Id.*

On November 20, 2017, Plaintiff received an injection from Dr. Jones in her right shoulder to relieve joint pain.   AR 568–69.   During the visit, she reported struggling with low back pain that had not improved after surgery, and Dr. Jones refilled Plaintiff's pain medications.   *Id.*   In December 2017, Plaintiff attended physical therapy with Ms. Palski and stated that she had stopped some of her exercises due to pain.   AR 563.   In response, Ms. Palski modified the exercises so Plaintiff would not feel pain.   *Id.*

An MRI of Plaintiff's spine on February 9, 2018 showed remaining "bilateral neural foraminal stenosis . . . which could impinge the L5 nerve roots on either side."   AR 647–48.

Later that month, Plaintiff saw Dr. Parker to discuss her ongoing low back pain. She reported that she was "getting around better than prior to surgery and not falling" but requested to remain on disability.   AR 560.   Dr. Parker stated that the recent MRI showed "no clear source for [Plaintiff's] symptoms."   *Id.*

In April 2018, Plaintiff saw Dr. Jones for back pain and medication review.   The doctor expressed concern about Plaintiff's depression and anxiety.   AR. 539, 541–42.   The record indicates that from May 2018 through July 2018, Plaintiff received mental health treatment for depression and anxiety.   AR 523–24, 527–28, 531–33, 535–37.   Plaintiff reported that medication improved her mood but that she also had ongoing back pain.   *Id.*

No party disputes that Plaintiff's "date last insured" for purposes of social security benefits is December 31, 2021.   Thus, Plaintiff must establish the onset of disability on or before that date to be entitled to disability insurance benefits.   Plaintiff contends that she became disabled on September 1, 2016.

## III.   Hearing Testimony

Plaintiff appeared at the hearing on August 8, 2018 along with her counsel and a vocational expert, Amanda Munzer.   AR 31–52.   Plaintiff was in a wheelchair for the hearing.   AR 35. The ALJ began by questioning Plaintiff about her twenty-seven years of work experience at Bayaud Enterprises and the work accommodations she received prior to resigning.   AR 34–35, 43.   Plaintiff stated that she loved her job but experienced spinal pain that worsened over the years.   AR 34, 43.   It affected her ability to walk or to sit at a desk "for longer than 10–15 minutes," and it would cause her to fall in the hallways.   AR 34.   She testified that her condition

began impacting her memory, and that she "started making really bad mistakes in [her] work." *Id.* She described the accommodations she received from Bayaud Enterprises, including taking time off of work after receiving back injections (that caused "severe reactions"); sitting in a "special chair;" using a "desk that lifted up [that] had a special pad on the floor" to stand on; and attending meetings or trainings "at home in bed, so [she] didn't have to go in and sit" in the office. AR 35.

When questioned about the wheelchair, Plaintiff stated she began using it for "about a year" prior to getting back surgery, and that her "doctor was scared [she] was going to hurt [her]self badly . . . so he gave [her] the wheelchair and a walker." AR 36. When describing surgical intervention, Plaintiff indicated that doctors "said it was going to be a difficult surgery and they wanted to wait [until her back] got severe enough." *Id.* When she eventually underwent lumbar surgery, she said it resulted in "[n]o change at all." AR 37. However, she also stated that her pain increased afterwards and that she took medication to relieve it. AR 38. She also testified that, after the surgery, she "could stand a little bit longer and . . . walk without falling[,]" but that three weeks prior to the hearing, she began falling again and could not currently stand for "longer than a minute or two" before collapsing. *Id.* AR 37–38. When describing her ancillary pain, Plaintiff stated that pain in her neck traveled to her right shoulder, arm, and hand. AR 43.

When questioned about housing, Plaintiff answered she did not have a permanent residence. AR 42. When asked about household chores, she said it was "difficult for [her] to even take a shower or go to the bathroom by [her]self." AR 38. She reported that her mom and sister did all of her laundry and helped her comb her hair, get dressed, and put on her shoes. AR

42.   She also stated that weakness and shaking in her hands make filling out forms and holding items without dropping them difficult.   AR 39.   For cooking, she asserted she was limited to frying an egg, making a sandwich, or "put[ting] a TV dinner in the microwave."   AR 42. Therefore, her mom and sister usually made dinner for her.   *Id.*   She alleged that she will fall forward if she tries to bend or kneel.   AR 40.   She added that her condition had negatively impacted her ability to drive, socialize, or maintain hobbies that she previously enjoyed.   *Id.* When asked about her anxiety and depression, Plaintiff stated she takes medications and will begin attending appointments at the end of August.   AR 43–44.

The ALJ then asked the vocational expert to consider the work-related limitations of postural movements of stooping, kneeling, crouching, or crawling limited to an occasional basis; a concentration impairment that precludes work requiring her to understand, remember, and carry out more than simple instructions; simple work-related decision-making; and no more than the usual work pressures in a competitive work setting.   The vocational expert testified that an individual of Plaintiff's age, experience, education, and limitations could perform the jobs of "[c]ashier II," "[f]ast-food worker," and "[h]ousekeeping cleaner."   AR 48–49.   The vocational expert answered Plaintiff's questions by testifying that the inability to do the postural requirements of stooping, kneeling, crouching, or crawling would eliminate the housekeeping cleaner and fast-food worker jobs, and that if she used a wheelchair, needed to change positions at will, or missed two days of work per month, it would additionally eliminate the cashier II position.   AR 50–51.

The ALJ issued an unfavorable decision on October 26, 2018.   AR 12–27.

## LEGAL STANDARDS

To qualify for benefits under sections 216(i) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA.   42 U.S.C. §§ 416(i), 423, 1382.

## I.     SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.   If she is, disability benefits are denied.   *See* 20 C.F.R. § 404.1520.   Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c).   If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.   *Id.*   Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.   *See* 20 C.F.R. § 404.1520(d).   If the impairment is not listed,

she is not presumed to be conclusively disabled.   Step Four then requires the claimant to show

that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from

performing work that she has performed in the past.   If the claimant is able to perform her

previous work, the claimant is not disabled.   *See* 20 C.F.R. § 404.1520(e), (f).   Finally, if the

claimant establishes a *prima facie* case of disability based on the four steps as discussed, the

analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that

the claimant has the RFC to perform other work in the national economy in view of her age,

education, and work experience.   *See* 20 C.F.R. § 404.1520(g).

## II.   Standard of Review

The Court's review is limited to whether the final decision is supported by substantial

evidence in the record as a whole and whether the correct legal standards were applied.   *See*

*Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287

F.3d 903, 905 (10th Cir. 2001).   Thus, the function of the Court's review is "to determine whether

the findings of fact . . . are based upon substantial evidence, and inferences reasonably drawn

therefrom.   If they are so supported, they are conclusive upon the reviewing court and may not

be disturbed."   *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v.*

*Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion. . . . However, [a] decision is not based on substantial evidence

if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence

supporting it."   *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted).

In addition, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Id.* (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)). But, in all cases, the Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

## ALJ's RULING

The ALJ ruled that Plaintiff did not engage in substantial gainful activity during the period from the alleged onset date of her disability, September 1, 2016, through the date of the ALJ's decision (Step One). AR 17. Further, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease, status post anterior interbody fusion, L5-S1; type II diabetes mellitus; and affective disorder (Step Two). *Id.* He found Plaintiff's other medically determinable impairment of obesity "had not had more than a minimal effect on her ability to perform work activity," and that the record did not "disclose sufficient objective medical evidence to substantiate" Plaintiff's nonmedically determinable impairments of anxiety and osteoarthritis of the knee. AR 17–18. Next, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). AR 18–19.

The ALJ then determined that Plaintiff had the RFC "to perform light work as defined in 20 CFR 404.1567(b) with the following restrictions: "claimant is limited to no more than occasional stooping, kneeling, crouching, and crawling, no performance of any work that requires understanding, remembering, and carrying out more than simple instructions; [and] no

13

performance of any work that requires making more than simple work-related decisions or adapting to more than the usual work pressures in a competitive work setting."   AR 20.

The ALJ also found that Plaintiff had past relevant work as a security officer, which had "sedentary exertion as both generally performed in the national economy and as actually performed by the claimant," but that Plaintiff was "unable to perform her past relevant work" with her medical conditions (Step Four).   AR 25.   The ALJ ultimately determined there were jobs in the national economy that Plaintiff could perform, such as "cashier II," "fast food worker," and "housekeeping cleaner."   AR 26.   As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA.   AR 27.

In December 2018, Plaintiff sought review from the Appeals Council, and in January 2019, the Appeals Council granted Plaintiff an extension of time before it acted on her case.   AR 4, 7. On August 21, 2019, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."   AR 1–6.   Plaintiff timely filed her Complaint in this matter on October 11, 2019.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) the ALJ failed to properly evaluate the medical evidence and medical source opinions in the manner required by the Commissioner's regulations; and (2) the ALJ failed to perform a proper pain analysis.   ECF 13 at 10, 14.

14

## **ANALYSIS**

**I.     Whether the ALJ failed to properly evaluate the medical evidence and medical source opinions in the manner required by the Commissioner's regulations**

The ALJ must "give consideration to all the medical opinions in the record" and "discuss the weight he assigns to them." *Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (internal quotation marks omitted).   "[T]he weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin*, 365 F.3d at 1215 (citing 20 C.F.R. § 401.1527(d)).   The applicable regulations governing the SSA's consideration of medical opinions distinguish among "treating" physicians, "examining" physicians, and "nonexamining" (or "consulting") physicians.   *See* 20 C.F.R. § 416.927.

According to the "treating physician rule," the Commissioner will generally "give more weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. § 404.1527.   Thus, "[a] treating physician's opinion must be given substantial weight unless good cause is shown to disregard it." *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289–90 (10th Cir. 1995).   A treating physician's opinion is accorded this weight because of the unique perspective the doctor has to medical evidence that cannot be obtained from an objective medical finding alone or from reports of individual examinations.   *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

Plaintiff first argues that the ALJ erred in rejecting Dr. Jones' November 2016 Med-9 form on which he indicated that she would be "totally and permanently disabled" for at least twelve

months due to musculoskeletal disorders.    ECF 13 at 10, AR 328, 426–27.    Specifically, the ALJ

stated the following about Dr. Jones' medical opinion:

> [ALJ] gives very little weight to the November 30, 2016 State of Colorado MED-9
> form from Dr. Jones . . . . This document is pursuant to a program utilizing different
> standards for disability than those employed by the Social Security Administration.
> Dr. Jones [] does not identify any laboratory findings, physical examination
> findings, or radiological reports, nor did []he point out any specific work-related
> functional restrictions.    Per 20 CFR 404.1527(d) and 20 CFR 416.927(d),
> conclusory opinions that an individual is "disabled," without any explanation of
> what "disabled" means, are opinions on an issue that is reserved to the
> Commissioner of the Social Security Administration.

AR 25.    Plaintiff argues that the ALJ's finding is not legitimate because Dr. Jones is a treating

physician and that his opinion is consistent with contemporaneous treatment records.    ECF 13 at

10–11.

As the ALJ noted, the ultimate decision of whether an applicant is disabled under the SSA's

rules is reserved for the Commissioner.    20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).    Thus,

when treating physicians complete a Med-9 form by checking a box indicating that the patient is

disabled but give no "meaningful analysis" to accompany it, the ALJ "appropriately g[i]ve[s] little

weight to" such conclusory opinions.    *Jazvin v. Colvin*, 659 F. App'x 487, 490 n.3 (10th Cir.

2016) (citing *Chapo v. Astrue*, 682 F.3d 1285, 1289 (10th Cir. 2012)); *see also Cowan v. Astrue*,

552 F.3d 1182, 1188–89 (10th Cir. 2008) ("[A] brief statement on the medical form was not a true

medical opinion.    It did not contain [the physician's] judgment about the nature and severity of

[the plaintiff's] physical limitations, or any information about what activities [the plaintiff] could

still perform."); *cf. Terwilliger v. Comm'r, Soc. Sec. Admin.*, 801 F. App'x 614, 622–23 (10th Cir.

2020) (explaining that when the physician checked a box on an employment medical form stating,

16

"I find this individual has been or will be unable to work at any job due to a physical or mental impairment[,]" without providing specific clinical findings in support, then the ALJ properly gave the opinion "little weight").

Although the ALJ does not refer to Dr. Jones as a treating physician, Plaintiff saw and received medical services from Dr. Jones concerning her back and shoulder pain on multiple occasions in 2016, 2017, and 2018.   AR 380–82, 426–27, 341–44, 612, 615–16, 568–69, 541–42.   This was sufficient to meet the definition of a "treating source."   20 C.F.R. § 416.927(a)(2). Nevertheless, the Court finds the ALJ was justified in affording little weight to Dr. Jones's opinion on Plaintiff's Med-9 form indicating that she was disabled.   *See* AR 328.   Because Dr. Jones did not add an explanation or medical findings to the Med-9 form, his statement regarding Plaintiff's disability was conclusory.   *See id.*

Plaintiff's medical records include general treatment notes from Dr. Jones, but these notes do not include medical opinions about Plaintiff's functional limitations.   The ALJ noted that Dr. Jones did "not identify any laboratory findings, physical examination findings, or radiological reports, nor did [ ]he point out any specific work-related functional restrictions."   AR 25.   The ALJ thereby stated good cause for giving little weight to Dr. Jones' medical observations.   *See Terwilliger*, 801 F. App'x at 622–23 (deciding ALJ was justified in giving little weight to treating surgeon's conclusory opinion on Med-9 form and to remaining opinions that omitted any explanation about functional limitations).

Plaintiff next argues that "the ALJ ignores restrictions that Dr. Parker imposed."   ECF 13 at 11.   Plaintiff discussed surgical options with Dr. Parker and, together, they chose to pursue

lumbar fusion surgery.   AR 334–35.   Dr. Parker and another doctor performed the surgery. AR 503–12.   Immediately after the procedure, in his post-surgery instructions, Dr. Parker restricted Plaintiff to lifting "nothing greater than five pounds," engaging in "light activity as tolerated," and walking for "20 minutes three times a day."   AR 505.   Plaintiff visited Dr. Parker three more times after her surgery to discuss continuing pain in her back and lower extremities. AR 560, 577, 582.   At these later appointments, Dr. Parker never mentioned the lifting or walking restrictions again.   *Id.*   He performed subsequent assessments that revealed Plaintiff had full strength in her lower extremities, and he advised Plaintiff to continue walking.   *Id.*   Lastly, he opined that he saw "no clear source" for Plaintiff's continuing symptoms or the degree of pain that she continued to report.   AR 560.

In his disability decision, the ALJ noted Dr. Parker's comment that the objective medical evidence did not support Plaintiff's reported symptoms but not his earlier lifting restrictions.   AR 23.   Ultimately, the ALJ found that Plaintiff had "the residual functional capacity to perform light work."   AR 20.   This category of work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . [and] requires a good deal of walking or standing."   20 C.F.R. § 404.1567(b).   The ALJ further limited Plaintiff to "no more than occasional stooping, kneeling, crouching, and crawling[.]" AR 20.

As stated above, an ALJ must "give consideration to all the medical opinions in the record" and "discuss the weight he assigns to them" in his disability decision.   *Mays*, 739 F.3d at 578 (internal quotation marks omitted).   Medical opinions include "statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's]

18

impairment(s), including . . . what [a claimant] can still do despite [the] impairment(s), and [the claimant's] physical or mental restrictions."   20 C.F.R. § 404.1527(a)(1).   However, "an ALJ's failure to weigh a medical opinion involves harmless error if there is no inconsistency between the opinion and the ALJ's assessment of residual functional capacity."   *Mays*, 739 F.3d at 578–79. Moreover, "[t]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence."   *Zumwalt v. Astrue*, 220 F. App'x 770, 778–79 (10th Cir. 2007).

In this case, even if Dr. Parker's post-surgery lifting limitation rose to the level of a medical opinion, it was harmless error for the ALJ not to explicitly discuss it.   For one, Dr. Parker gave the instruction only once, immediately after surgery.   AR 505.   The record does not suggest that the limitation remained in place as Plaintiff's recovery progressed.   Second, Dr. Parker still permitted light activity as tolerated.   *Id.*   Third, the ALJ noted that Dr. Parker referred Plaintiff to outpatient physical therapy, where Plaintiff was instructed to continue walking every day and to ride a stationary bicycle.   AR 21.   Finally, Dr. Parker later stated that objective medical evidence did not corroborate Plaintiff's pain complaints after a period of recovery.   AR 560. The ALJ did discuss Dr. Parker's later medical opinion that "there was no clear source" for Plaintiff's ongoing pain in her back and right lower extremity.   AR 23.   Consequently, the Court finds no reversible error in the ALJ's omission of the initial one-time lifting restriction.

Plaintiff argues that the ALJ committed reversible error by affording too much weight to Dr. Barton's medical opinion.   ECF 13 at 12.   Dr. Barton is a non-examining state agency physician who provided his opinion in the form of an RFC evaluation before Plaintiff had surgery.

AR 58–63.   Plaintiff argues that it was wrong for the ALJ to rely on Dr. Barton's opinion without also considering Dr. Parker's post-surgery restriction on how much weight Plaintiff could lift. ECF 13 at 12.   Further, Plaintiff argues that the ALJ's reliance on Dr. Barton's opinion was not cured by the ALJ's reference to the post-surgical imaging that Dr. Parker read as showing improvement in her back.   *Id.*; AR 560.

As the Court previously stated, the ALJ did not "ignore" Dr. Parker's medical assessments. To the contrary, he noted how Dr. Parker saw "no clear source" for Plaintiff's alleged symptoms twelve weeks after her surgery, which superseded Dr. Parker's previous one-time lifting limitation imposed immediately after surgery.   AR 23, 560.   Dr. Parker's concluding medical assessment therefore supports the ALJ's reasoning that the objective medical evidence was consistent with Dr. Barton's medical opinion.

Plaintiff argues that the ALJ could not legitimately rely on Dr. Barton's RFC recommendation because he made it before Plaintiff's surgery.   ECF 13 at 12.   Plaintiff recites the proposition from *Chapo* that an ALJ's reliance on older evidence is "troubling."   682 F.3d at 1293.   However, in *Chapo*, the claimant's medical records "underwent material changes in the twenty months" between the old medical opinion the ALJ relied on (which omitted any reference to the claimant's later medical conditions) and the ALJ's decision denying disability.   *Id.* at 1292–94.   Here, by contrast, Dr. Barton gave his medical evaluation less than three months before Plaintiff's surgery, in which he acknowledged that Plaintiff had a history of spondylolisthesis, arthritis, lumbar degeneration, chronic back pain, and other health conditions.   AR 58–59. Moreover, the surgeon's concluding assessment following the recovery period indicates an

*improved* condition.    Even though Dr. Barton's advisory report predates the surgery and the initial lifting restriction, it is not necessarily inconsistent with Dr. Parker's concluding assessment. *Chapo*, therefore, does not help Plaintiff.    The fact that a medical opinion came earlier in time than another does not, by itself, discount the earlier opinion.

> The ALJ gave the following reasons for affording great weight to Dr. Barton's opinion:

> Dr. Barton opined that the claimant was capable of performing light work with restrictions to occasional postural activities.    Dr. Barton supported his opinion that the claimant was capable of performing light work by referencing MRI results that indicate grade I spondylolisthesis in the lumbar spine.    Additionally, Dr. Barton's opinion that the claimant is able to perform light work is consistent with post-surgical imaging of the claimant's lumbar spine that indicated improvement with foraminal narrowing as compared to before the ALIF.    Therefore, the undersigned affords great weight to Dr. Barton's opinion that the claimant is limited to light work because his opinion is supported by medical imaging that demonstrates an underlying medical pathology that has improved since the claimant's surgery in July 2017.

AR 24 (record citations omitted).    The fact that the ALJ compared medical imaging of Plaintiff's spine to Dr. Barton's opinion only served to support the ALJ's rationale.    *See Cassel v. Harris*, 493 F. Supp. 1055, 1056 (D. Colo. 1980) (noting that "an ALJ must consider objective medical facts" in addition to other evidence in the record).    Thus, the Court finds that the ALJ's reasoning was sufficient to afford great weight to Dr. Barton's medical opinion.

## II.    Whether the ALJ failed to perform a proper pain analysis

Plaintiff argues that the ALJ erred by "failing to include any manipulative limitations" related to her shoulder pain.    ECF 13 at 13.    Plaintiff received two injections in her right shoulder to alleviate pain: one in April 2017, which "helped for many months," and another in November 2017.    AR 341–44, 568–69.    Plaintiff sought no further treatment.    At the hearing,

Plaintiff mentioned her shoulder pain only once, stating that "pain in [her] neck . . . goes down into [her] shoulder."   AR 43.

The ALJ discussed Plaintiff's right shoulder pain in his decision, acknowledging that Plaintiff received an injection in November 2017 "to alleviate pain."   AR 21.   Further, the ALJ discussed manipulative limitations in the context of Plaintiff's neck pain complaint, stating:

> The claimant's allegations of manipulative limitations stemming from impairments in her neck are not consistent with MRI imaging of the claimant's cervical spine revealing mild diffuse disc degeneration and a normal cervical cord with normal signal intensity.   The claimant's allegations of manipulative restrictions are further inconsistent with her statements to Dr. Joshua M. Scheidler denying any loss of manual dexterity.

AR 23 (record citations omitted).

"[T]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence."   *Trujillo v. Comm'r, Soc. Sec. Admin.*, 818 F. App'x 835, 841 (10th Cir. 2020) (citing *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996)). Generally, the ALJ must provide enough detail to ensure that the "RFC finding is not a bare conclusion that [the Court is] unable to meaningfully review."   *Id.*   Here, the ALJ stated that any manipulative limitations "stemming from impairments in [Plaintiff's] neck" were not supported by objective medical evidence.   AR 23.   The ALJ did not explicitly link Plaintiff's shoulder condition to this statement, but Plaintiff herself did when, at the hearing, she said that her neck pain traveled to her shoulder.   AR 43.   Further, the Court notes that Plaintiff's medical records contain only two instances of receiving shoulder injections, one of which relieved pain for many months.   AR 568.   Thus, substantial evidence supports the ALJ's finding that Plaintiff has

no manipulative impairments greater than what the RFC assessment accommodates.

Plaintiff also argues more broadly that "[t]he ALJ failed to evaluate Ms. Romero's subjective allegations" of pain, because her "statements regarding her symptoms and combined medical conditions were consistent with what she told her treating medical providers."   ECF 13 at 14.   She asserts that even though the ALJ stated that her complaints of pain were "not entirely consistent" with the medical evidence, "that did not mean Ms. Romero had no pain or limitation." ECF 13 at 15.   Overall, she states that she is "unable to perform work on a sustained basis due to the combination of her physical and psychological impairments."   *Id.*

An ALJ must consider a claimant's symptoms, including pain, to determine whether a severe physical or mental impairment exists.   20 C.F.R. §§ 404.1529, 416.929.   In making this determination, they follow a two-step process.   SSR 16-3P (Oct. 26, 2017).   First, they consider "whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms."   *Id.*   Second, they "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities."   *Id.* This involves examining objective medical evidence and other evidence from the claimant, medical sources, and non-medical sources, and requires considering various factors listed in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3).   *Id.*   Overall, an ALJ may "not reject [a claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [the] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements."   20 C.F.R. § 404.1529.

In this case, the ALJ followed the two-step process required by the Social Security Administration.   *See* SSR 16-3P.   First, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" AR 22. Second, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" *Id.*

Regarding Plaintiff's physical impairments, the ALJ included several pages of analysis and noted that her statements about her pain levels were "inconsistent because objective medical evidence does not support the claimant's allegations of increased post-surgical lumbar pain."   AR 20–24.   The ALJ summarized his findings with the following statements:

> While the claimant's lumbar spine initially featured severe foraminal narrowing at L5-S1, a post-surgical MRI of the claimant's lumbar spine demonstrated that the foraminal stenosis at the same disc space had improved.   Additionally, the claimant's testimony that her ALIF did not change her propensity to fall is inconsistent with reports that she made to her physicians at Kaiser Permanente indicating that she was not falling after surgery.   The claimant's reports of an inability to stand for longer than a minute or two are inconsistent with repeated physical examination findings that the claimant's station was normal and negative femoral tests.   Additionally, a pre-operative physical examination of the claimant revealed that the claimant was able to move all of her extremities within normal limits.   Referring to a recent MRI, Dr. Erik Parker stated that there was no clear source for the claimant's ongoing lower back pain with radiation to the right lower extremity.   However, the claimant's reports of lower back pain are consistent with a lesser degree of restriction than alleged.   In September of 2017, approximately two-months [sic] subsequent to the claimant's ALIF, x-ray imaging of the claimant's lumbar spine revealed stable mild anterolisthesis at L5-S1 with spondylolysis.   Additionally, the claimant's pain symptoms restricts [sic] her postural functioning, as is consistent with physical therapy findings that pain limited the claimant's flexion and extension of her trunk.   Therefore, the claimant's degenerative disc disease, status post anterior lumbar interbody fusion, L5-S1 results in a limitation to light work . . . with further restrictions to no more

than occasional stooping, kneeling, crouching, and crawling."

AR 22–23 (record citations omitted).    Further, the ALJ found that the "treatment records do not support [Plaintiff's] allegations of the need to use a wheelchair[,]" because she requested a wheelchair the same day she requested disability paperwork and because she was "able to slowly stand from the wheelchair and transfer to a regular chair" during a post-surgical examination.    AR 23.    As discussed above, the ALJ properly assessed Plaintiff's manipulative limitations.    The ALJ also acknowledged that Plaintiff took pain medicine, noting that her "use of narcotic pain medication has been conservative" because she feared becoming dependent on it.    AR 21.    He noted that these medications "ease her pain symptoms for about 4 hours at a time."    AR 22.

The ALJ properly did not exclusively rely on objective medical evidence when he analyzed Plaintiff's pain allegations.    He also noted the contradiction between statements Plaintiff made during the hearing and to her healthcare providers regarding her propensity to fall and her need for a wheelchair.    AR 22–23.    Moreover, he contrasted Plaintiff's allegations that her pain increased after lumbar surgery with her testimony that pain medication eased her pain in four-hour increments.    AR 22.    Indeed, despite these discrepancies, the ALJ did not entirely reject Plaintiff's statements about her pain; rather, he concluded that her lower back pain was "consistent with a lesser degree of restriction than alleged."    AR 23.    Thus, the Court finds that the ALJ sufficiently considered Plaintiff's physical conditions and their impact on her alleged symptoms.

Regarding Plaintiff's psychological impairments, the ALJ noted that Plaintiff received treatment and medications for "symptoms related to depression and anxiety[,]" and that Plaintiff "testified that stress triggers the pain in her back[.]"    AR 21–22.    The ALJ summarized his

findings with the following statements:

> The claimant's mental health symptoms are partially consistent with the record. In a prehearing function report, the claimant expressed that her inability to function causes depressive symptoms. During her consultative examination in April of 2017, the claimant's mental status examination was unremarkable. However, the consultative examiner diagnosed the claimant with an adjustment disorder with mixed anxiety and a depressed mood. Approximately one year later, Patient Health Questionnaires at Kaiser Permanente consistently demonstrated that the claimant has moderate depression. . . . The claimant's PHQ-9 scores demonstrating moderate depression coupled with the claimant's continued follow-up for mental health related concerns justifies a workplace limitation to no performance of any work that requires understanding, remembering, and carrying out more than simple instructions; making more than simple work-related decisions or adapting to more than the usual work pressures in a competitive work setting.

AR 23 (record citations omitted).

Contrary to Plaintiff's assertions, the ALJ adequately addressed her ability to perform the mental demands of work and limited her to jobs with simple instructions. *Id.* Thus, the Court finds that the ALJ sufficiently considered Plaintiff's psychological conditions and their impact on her ability to perform work.

Finally, Plaintiff cites her "outstanding employment history," and states that "if [she] could still work, she would." ECF 13 at 16–17. Overall, she contests the ALJ's findings discounting her credibility because "several of the factors relied upon by the ALJ are found to be unsupported or contradicted by the record[.]" ECF 13 at 17. The Court disagrees, finding that the ALJ's credibility determination is supported by specific and non-contradictory evidence from the medical records and from Plaintiff's own testimony.

The Court notes that "[d]isability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to

preclude any substantial gainful employment." *Trujillo v. Comm'r, Soc. Sec. Admin.*, 818 F. App'x at 844 (citing *Brown v. Bowen*, 801 F.2d 361, 362–63 (10th Cir. 1986)). Although the ALJ credited Plaintiff's pain allegations to a degree, he ultimately concluded that Plaintiff could still engage in light work. AR 20. Because the ALJ properly followed the two-step process when analyzing Plaintiff's subjective symptoms and relied upon substantial evidence in making his determination, no remand is needed in this case.

## CONCLUSION

The ALJ did not fail to properly evaluate the medical evidence and medical source opinions in the manner required by the Commissioner's regulations. Further, the ALJ did not err in considering Plaintiff's subjective allegations of pain. Accordingly, the decision of the ALJ that Plaintiff Renee Romero was not disabled from September 1, 2016, through October 26, 2018, is AFFIRMED.

Entered this 3rd day of November, 2020, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge